******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ELIZABETH K. TURNER
## (AC 41179)

Lavine, Prescott and Bright, Js.

*Syllabus*

Convicted, following a jury trial, of various crimes, including felony murder and robbery in the first degree in connection with the stabbing death of two victims, B and P, the defendant appealed. B had invited the defendant and her husband, T, to live with her in her home. Several months later, the defendant directed T to tell B that the defendant was in jail and needed money for bail, which was not true. T and the defendant used the money to buy drugs. The day after the defendant's bail scheme, T murdered B, and her adult son, P, in B's home. After the murders, the defendant went through B's purse and took money, gift cards, and the keys to B's automobile. In the days following the murders, the defendant and T sold various possessions of the victims, and the defendant spent the money she procured from those sales on food, hotels, and cocaine. The defendant and T then traveled to Baltimore, where they were arrested. *Held*:

1. The defendant could not prevail on her claim that her due process rights were violated because the trial court improperly allowed the jury to base a guilty verdict on a legally invalid but factually supported theory that a completed larceny by false pretenses, which was accomplished by the bail scheme, that preceded a use of force, and was part of a continuous course of larcenous conduct, could be the predicate felony for robbery and felony murder: the defendant's claim that a larceny by false pretenses could not be a predicate felony for robbery or felony murder because no force was used to obtain the property was unavailing, as larceny by false pretenses could be a proper predicate for a robbery where force was used in a larceny by false pretenses in order to retain the property immediately after the taking, and, therefore, the defendant's claim alleged an improper charge to the jury that was legally valid but was unsupported by the evidence; moreover, although the larceny by false pretenses was complete before the victims were murdered and, thus, the trial court should not have included references to it in its charge to the jury, that instructional error was harmless, the defendant having failed to meet her burden of establishing that any error would have, more probably than not, affected the jury's verdict, as the defendant conceded that there was a factually supported basis for the felony murder and robbery convictions, including evidence that supported the conclusion that the defendant and T had planned to kill the victims in order to take, and obtain through the sale of the victims' possessions, money for drugs, and it was clear from the verdict on the counts for felony murder as to P, larceny in the third degree, and robbery in the first degree as to P, in the context of the charge, that the jury based its verdict on the larcenies that occurred immediately following the murders.

2. The defendant's claim that there was insufficient evidence to support her conviction of attempt to possess narcotics, which was based on her claim that there was insufficient evidence that she actively attempted to possess narcotics, was unavailing: D, whose DNA was found in the backseat of B's automobile, testified that he gave cocaine to an intermediary in exchange for the use of the car and he gave a basic description of the people in the car, there was evidence that the defendant took the keys to the car shortly after T killed B, and the jury reasonably could have concluded that the defendant and T used the car after the murders to buy drugs, that the defendant was present and involved in the transaction, which involved narcotics, and that the defendant, therefore, engaged in conduct intending to result in the possession of narcotics; accordingly, there was a reasonable view of the evidence that supported the jury's verdict of guilty of attempted possession of narcotics beyond a reasonable doubt.

Argued January 11—officially released June 25, 2019

Substitute information, in the first case, charging the defendant with the crimes of conspiracy to commit larceny in the third degree and accessory to larceny in the third degree, and substitute information, in the second case, charging the defendant with three counts of the crime of robbery in the first degree, two counts of the crime of felony murder, and with the crimes of criminal attempt to possess narcotics, larceny in the third degree, burglary in the third degree, hindering prosecution in the second degree, forgery in the second degree, conspiracy to commit robbery in the first degree, and tampering with evidence, and substitute information, in the third case, charging the defendant with the crimes of larceny in the second degree, using a motor vehicle without the owner's permission, and forgery in the second degree, brought to the Superior Court in the judicial district of Waterbury, where the cases were consolidated; thereafter, the matter was tried to the jury before *Cremins, J.*; verdicts and judgments of guilty, from which the defendant appealed. *Affirmed.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani* and *Cynthia S. Serafini*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

LAVINE, J. This case tragically exemplifies the adage that no good deed goes unpunished. In February, 2012, Donna Bouffard invited a homeless couple, the defendant, Elizabeth K. Turner, and her husband, Claude Turner, to live with her in her home.[1] In June of the same year, Turner brutally murdered both Bouffard and her adult son, Michael Perkins, in Bouffard's Watertown home. The defendant appeals from the judgments of conviction, rendered after a jury trial, of two counts of felony murder in violation of General Statutes § 53a-54c,[2] one count of criminal attempt to possess narcotics in violation of General Statutes § 53a-49 and General Statutes (Rev. to 2011) § 21a-279 (a), one count of larceny in the third degree in violation of General Statutes § 53a-124 (a), one count of burglary in the third degree in violation of General Statutes § 53a-103 (a), one count of hindering prosecution in the second degree in violation of General Statutes § 53a-166 (a), two counts of forgery in the second degree in violation of General Statutes § 53a-139 (a) (1), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), one count of robbery in the first degree in violation of § 53a-134 (a) (3), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a), one count of tampering with evidence in violation of General Statutes (Rev. to 2011) § 53a-155 (a) (1), one count of conspiracy to commit larceny in the third degree in violation of §§ 53a-48 and 53a-124, one count of accessory to larceny in the third degree in violation of General Statutes §§ 53a-8 and 53a-124, one count of larceny in the second degree in violation of General Statutes § 53a-123, and one count of using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b. On appeal, the defendant claims that (1) the trial court improperly allowed the jury to consider a legally invalid but factually supported theory for the robbery and felony murder convictions, specifically, that a larceny by false pretenses that is part of a continuous course of larcenous conduct culminating in a murder can provide the predicate felony for a robbery and felony murder, and (2) there was insufficient evidence to support the conviction of attempted possession of narcotics. We affirm the judgments of the trial court.

The record discloses the following facts that the jury reasonably could have found on the basis of the evidence presented at trial. In February, 2012, Christine Perkins, Bouffard's daughter, and Christine Perkins' then husband, David Ortiz, met the Turners at the Waterbury mall. Christine Perkins recognized Turner from previously having seen him in a Salvation Army food line. As the defendant was noticeably pregnant at the time, Christine Perkins and Ortiz invited her and Turner to stay with them in Bouffard's home. As a result, the

Turners moved into Bouffard's home. Eventually, the relationship between the Turners and Bouffard deepened, and the defendant and Turner started calling Bouffard, "mom."

In April, 2012, Bouffard received a disability settlement of $13,000, which she put in an envelope that she hid under her mattress. When money began to disappear from the envelope, she moved it into a safe. Her relationship with the Turners soured, and Bouffard accused the defendant of stealing from her. On April 19, 2012, the same day that she left for vacation, Bouffard served eviction papers on Christine Perkins and Ortiz so that Michael Perkins, who had moved out of her house due to a conflict with Ortiz, could return to the home.

At the end of April, 2012, upon returning from vacation, Bouffard noticed that the safe had been moved and pried open, and approximately $6000 was missing. Bouffard accused the defendant of taking the money. The defendant later admitted to police that she had told Turner to take money from under the mattress and from the safe. The defendant explained that Turner did everything for her, that he did all he could to try to keep her happy, that she and Turner used the stolen money to buy drugs, and that she was "in her glory."

As indicated, the relationship between Bouffard and the Turners deteriorated. The defendant, on more than one occasion, expressed her desire to put rat poison into Bouffard's and Michael Perkins' food because they were "always in her business." The defendant also mentioned to a stranger that she and Turner didn't like Bouffard and Michael Perkins. After Bouffard had been killed, the defendant explained to police that Bouffard would lecture her about how she, Bouffard, was unhappy, which the defendant described as "[c]ondescending. Poor me, poor me. . . . Everyone needs to wait on me." The defendant admitted to having arguments with Bouffard, and that when Bouffard would start "running her mouth," the defendant would "usually go upstairs because [she didn't] want to hear it because [she would] cuss [Bouffard] out and make her cry." Bouffard asked the defendant and Turner to leave in May, 2012, but they did not.

In June, 2012, only Bouffard, Michael Perkins, Turner, and the defendant lived in the home. On June 28, 2012, the defendant directed Turner to tell Bouffard that she was in jail and needed $50 for bail, which was untrue. After Bouffard gave Turner the $50, Turner and the defendant used the money to buy drugs. The defendant and Turner performed the ruse one more time that evening, with Turner explaining to Bouffard that the bond was actually $100, and he needed another $50 to get the defendant out of jail. Bouffard gave Turner the additional $50.[3]

When the Turners returned to Bouffard's home in the

early hours of June 29, 2012, Michael Perkins was asleep on the couch and Bouffard was awake in her bedroom. The defendant later stated to police that Bouffard was "running her mouth" and "she didn't want to listen to [Bouffard] run her mouth, so she went upstairs, but she was curious about what might be taking place downstairs, so she lowered the sound on the television so that she could listen in." She heard some banging and Michael Perkins yelling, and went downstairs. She saw Turner stabbing Michael Perkins in the stomach, but did not protest or intercede. Michael Perkins was saying, "please stop, I love you." Bouffard did not come out of her room, which led the defendant to believe that Turner had already killed her. Turner told the defendant to go back upstairs, which she did. A short while later, Turner went upstairs and handed the defendant Bouffard's purse. The defendant went through the purse and took money, gift cards, and the keys to Bouffard's Lincoln town car. The defendant went downstairs and walked past the lifeless bodies of Bouffard and Michael Perkins, each with numerous stab wounds, to go into Bouffard's room and look for the paperwork for Bouffard's car.

The Turners took Bouffard's car and picked up Anthony Acosta, a friend of Turner's; Turner stopped to buy marijuana and cocaine. They returned to the house, at which point Acosta saw the bodies of Bouffard and Michael Perkins lying on the floor. The three proceeded to use the drugs. The defendant told Acosta that she regretted telling Turner to kill the victims. When the defendant was rifling through the victims' belongings, she discovered that Bouffard had been served with an eviction notice, and commented to Acosta, "good for them. They deserved it."

In the following days, the Turners, accompanied by Acosta, sold Michael Perkins' scooter, guitar, and Wii system, as well as Bouffard's camper, phone, and jewelry. They also attempted to sell a television and took a gun from Bouffard's home. The defendant later admitted to police that both she and Turner had the idea to sell Bouffard's camper and other items. The defendant also made an effort to take money out of Bouffard's bank account by means of a check that she had forged. She additionally took Michael Perkins' debit card, and because she knew his pin number, took money out of his account and got cash back on items purchased with the card. The Turners continued to use Bouffard's Lincoln town car and ultimately sold the car for $400. The defendant spent the money she procured from the sale of Bouffard's and Michael Perkins' possessions on food, hotels, and cocaine.

The Turners then traveled to Baltimore, where they were arrested. The defendant was interviewed by Watertown police in Baltimore, after which the Turners were extradited to Connecticut. After a follow-up inter-

view with police in Watertown, the defendant was seen kissing Turner through the bars of her cell. While in prison awaiting trial, she wrote a letter to a friend in which she acknowledged that she "made a huge mistake" that resulted in "lives [being] lost." Following a jury trial, the defendant was sentenced to a total effective sentence of sixty years. Additional facts, as they reasonably could have been found by the jury, will be set forth as necessary.

I

The defendant has conflated some of her arguments and legal theories in a way that requires us to recharacterize them. The defendant claims that her due process rights were violated because the trial court improperly allowed the jury to base a guilty verdict on a legally invalid but factually supported theory that a completed larceny *by false pretenses*[4] that precedes a use of force, and is part of a continuous course of larcenous conduct, can be the predicate felony for robbery and felony murder. The larceny by false pretenses accomplished by the bail scheme ended *prior* to the murders, the defendant contends, and was not accompanied by force. Consequently, the bail scheme lacked a nexus to the murders. The essence of the defendant's claim is that the trial court improperly instructed the jury in this regard, and, as such, the defendant's robbery and felony murder convictions may have been predicated on an inadequate legal theory that was purportedly argued by the state.[5] The larceny by false pretenses, the defendant contends, could not have provided the basis for a predicate felony for a robbery because it was not accompanied by force, but the court's charge, in light of the state's position during trial and in its closing argument, mistakenly created the impression that it could.[6]

Although it is possible to construe the defendant's claim that the court permitted the state to make a legally invalid but factually supported claim to be, in reality, a camouflaged claim of prosecutorial impropriety, the defendant specifically disavows that she is raising a prosecutorial impropriety claim and does not provide briefing on prosecutorial impropriety. Similarly, the defendant's claim could be construed that the court abused its discretion by allowing the state to make an improper closing argument, but, again, the defendant has not briefed such a claim. Consequently, any claim that the court improperly allowed the state's argument is, therefore, inadequately briefed and will not be considered. Appellate courts "are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than [mere] abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed." (Internal quotation marks

omitted.) *McClancy* v. *Bank of America, N.A.*, 176 Conn. App. 408, 414, 168 A.3d 658, cert. denied, 327 Conn. 975, 174 A.3d 195 (2017). Thus, we are left with the defendant's claim that the court erred in its instruction to the jury.

Because the jury instruction included a definition of larceny by false pretenses, the defendant argues that the jury might have found her guilty of robbery and felony murder under the misguided understanding that a completed larceny by false pretenses that preceded the use of force can be the predicate crime of a robbery and felony murder. Thus, the defendant in essence makes an instructional error claim and argues that her conviction may have resulted from a legally invalid but factually supported theory. Citing *Stromberg* v. *California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931),[7] the defendant argues that the verdict must be reversed if this court cannot be certain that the jury found her guilty under a valid legal theory. In response, the state argues that the defendant is really challenging a factually unsupported instruction, not a legally invalid one. Consequently, the holding in *Stromberg* does not apply. We agree with the state.[8]

Before turning to the defendant's principal claim, it is necessary to discuss the crimes of robbery and felony murder. "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133.

"Felony murder[9] occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime. . . . The two phrases, in the course of and in furtherance of, limit the applicability of the statute with respect to time and causation." (Footnote added; internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 290, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016).

"In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 786, 717 A.2d 1140 (1998). "The requirement that the death be 'in the course of' the felony focuses on the temporal relationship between the killing and the underlying felony." *State* v. *Cooke*, 89 Conn. App. 530, 536, 874 A.2d 805, cert. denied, 275 Conn. 911, 882 A.2d

677 (2005). "[I]f the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, *even though some time immediately before or after*, it is considered to be in the course of the robbery or the attempted robbery within the meaning of [§ 53a-133]." (Emphasis added; internal quotation marks omitted.) *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986).

The defendant argues that a larceny by false pretenses could not be a predicate felony for robbery or felony murder because no force was used to obtain the property. Once the property was obtained, the defendant argues, the larceny by false pretenses was complete and any subsequent use of force would not have a nexus to the larceny. According to the defendant, the theory that the larceny by false pretenses could support the felony murder and robbery conviction was not legally valid and, thus, her convictions must be reversed. The state argues that, at most, the *facts* of this case would not support the legal theory, but that that the theory itself is legally valid. The state argues that because there were other facts that the defendant concedes support the felony murder and robbery convictions, the defendant's claim fails.

The United States Supreme Court and our Supreme Court have discussed the significant difference between a legally invalid basis and a factually unsupported basis for a conviction. In *Griffin* v. *United States*, 502 U.S. 46, 47–48, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), a jury instruction included a charge of defrauding the Drug Enforcement Administration despite the lack of supporting evidence. When analyzing how a reviewing court should treat such an instructional error, the United States Supreme Court rejected the argument that *Stromberg* should apply and limited *Stromberg*'s application by stating that "[the] language, and the holding of *Stromberg*, do not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." Id., 53.

Furthermore, *Griffin* distinguished the situation before it, where the instruction was challenged for including a theory of liability that was not supported by the evidence, from situations where one of the possible grounds for conviction was legally insufficient, such as in *Yates* v. *United States*, 354 U.S. 298, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957), overruled on other grounds by *Burks* v. *United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), where a jury instruction included a charge that was barred by a statute of limitations. *Griffin* v. *United States*, supra, 502 U.S. 55–56. The Supreme Court reasoned, that "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—

whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence . . . ." (Citation omitted; emphasis omitted.) Id., 59. The Supreme Court concluded that "if the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." Id., 60.

Building on *Griffin*, our Supreme Court in *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994), explained that when a court charges the jury on a legally adequate theory for which there was no evidence, "[t]he jurors . . . were in a position to be able to evaluate the testimony presented and to assess whether the charged theory was supported by the evidence." Id., 540. Our Supreme Court noted that "a factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation." Id., 539.

Based on these cases, we disagree with the defendant's argument because it does not take into account the possibility that force could be used in a larceny by false pretenses in order to retain the property immediately after the taking. See General Statutes § 53a-133 ("[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of . . . the retention [of the property] immediately after the taking [of the property]"). Although we agree with the defendant that, in the present case, the killings did not occur until after the bail scheme was completed, this does not mean that there could never be a circumstance in which a use of force has a proper nexus to a larceny by false pretenses in order to constitute a robbery. We set forth the following hypothetical as an example. Suppose that during the course of the bail scheme, Michael Perkins glanced out the window and saw the defendant in the car. If he exclaimed, after Bouffard has handed over the money, that the defendant was not in jail but was outside, and Turner immediately used physical force in order to retain possession of the money, then the larceny by false pretenses could have been a proper predicate for a robbery.[10] We, therefore, view the defendant's claim as alleging an improper charge to the jury that was legally valid but was unsup-

ported by the evidence. For such a claim, our Supreme Court's decision in *Chapman* controls.

We agree with the defendant that the larceny by false pretenses was complete before the victims were murdered, so the court should not have included references to it in its charge.[11] See *State* v. *Chapman*, supra, 229 Conn. 537 ("It is improper for the trial court to read an entire statute to a jury when the pleadings or the evidence support a violation of only a portion of the statute. . . . The jury charge was overly expansive because the state had presented no evidence [for the portion of the charge]." [Citations omitted.]). Nevertheless, the court's error was harmless and does not require reversal.

"[A reviewing court] consider[s], on a nonconstitutional basis, the harmfulness of the impropriety in the trial court's instruction. When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. . . . The defendant must show that it is more probable than not that the erroneous action of the court affected the result. . . .

"For an erroneous portion of a charge to be reversible error, [an appellate] court must consider the whole charge and it must be determined, in appeals not involving a constitutional question, if it is reasonably probable that the jury [was] misled . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 544–45. "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 599, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

Although the trial court's charge included, as an example of a larceny, three references to larceny by false pretenses, as well as a definition of false pretenses,[12] the defendant cannot meet her burden of establishing that any error would have, more probably than not, affected the jury's verdict because the defendant concedes[13] that there was a factually supported basis for the felony murder and robbery convictions. In particular, the evidence supported the conclusion that the Turners had, either together as equal partners or, more likely, with the defendant as the brains of the operation, planned to kill the victims in order to take, and obtain through the sale of the victims' possessions, money for drugs. Some of the evidence that provides support for this inference includes: the defendant repeatedly expressed the desire to put rat poison in the victims' food; she told police that Turner would do anything for her in order to keep her happy; she had directed Turner to steal money from under the mattress and in the safe; she personally orchestrated the bail scheme; she described Bouffard as condescending and "running her

mouth"; she did not intercede when she witnessed Turner stabbing Michael Perkins; she rifled through Bouffard's purse immediately following the murders, taking Bouffard's money, gift cards, and keys; she walked past the victims' bodies to look for the paperwork for the car, and, shortly thereafter, she and Turner left to acquire drugs; the Turners later used the drugs at the home with the two bodies lying there; she had mentioned to Acosta that she regretted telling Turner to kill the victims; she was glad to find out that the victims had been facing eviction; and she admitted in her letter from jail that she had made a huge mistake, resulting in lives lost.[14] These facts, and others, provided a basis for the jury to have concluded beyond a reasonable doubt that at least the killing of Bouffard was planned in advance and was designed to gain possession of her money and property, and that Michael Perkins was killed because he was a witness and/or attempted to intervene.[15] This conclusion is also supported by the verdict for the counts alleging felony murder as to Michael Perkins, larceny in the third degree, and robbery in the first degree as to Michael Perkins, in which the jury found the defendant guilty of larceny for actions that took place *after* the murders, which factually supports the robbery and felony murder convictions. See *State* v. *Johnson*, supra, 165 Conn. App. 290–91 ("Felony murder occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime. . . . We previously have defined the phrase in the course of for purposes of § 53a-54c to include the period immediately before or after the actual commission of the crime . . . ." [Citation omitted; internal quotation marks omitted.]); *State* v. *Ali*, 92 Conn. App. 427, 440, 886 A.2d 449 (2005) (finding that fact that defendant took items after murder sufficiently supported felony murder conviction), cert. denied, 277 Conn. 909, 894 A.2d 990 (2006).

The defendant was charged with larceny in the third degree for committing a larceny that exceeded $2000 worth of property. When charging the jury on that count, the court stated that, "[i]n this case, the property allegedly stolen is a Wii game system, guitar, television, jewelry, cell phone, moneys, gift cards, camper, gun, and scooter."[16] In other words, by finding her guilty on that charge, it is quite clear that the jury found that the defendant committed larceny immediately *after* the murders through the theft of Bouffard's and Michael Perkins' property, which, as the defendant concedes in her brief and in oral argument to this court, serves as a proper predicate for the robbery and felony murder convictions.

Additionally, the jury found the defendant guilty as to the counts that charged her with felony murder and robbery as to Michael Perkins. In its charge to the jury on the count alleging felony murder as to Michael Per-

kins, the court instructed that "the defendant, acting alone or with one or more other persons, committed or attempted to commit the crime of robbery of . . . Michael Perkins . . . ." Similarly, in its charge to the jury on the count alleging robbery as to Michael Perkins, the court instructed that "the state must prove beyond a reasonable doubt that . . . the defendant wrongfully took property from an owner . . . Michael Perkins . . . of the property or to appropriate such property to [herself] or a third person." In so doing, the court instructed the jury that to find the defendant guilty of both counts, the jury would need to find that the defendant took property specifically from Michael Perkins. Because his property was not involved in the bail scheme, it is clear that the jury, in finding the defendant guilty of those counts, based its verdict on the larcenies that occurred immediately *following* the murders, and not on any larceny by false pretenses. We, therefore, conclude that there was a firm and proper factual basis for the jury's verdict in the present matter because it is clear, in the context of the charge, that the jury based its verdict on the larcenies that occurred immediately *following* the murders.

"Our task on appeal is not to second guess the jury's findings . . . ." *State* v. *Bradley*, 39 Conn. App. 82, 91, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996). Here, there is a plausible factual and legal basis for the jury's verdict in regard to the robbery and felony murder counts. "The jurors . . . were in [the best] position to be able to evaluate the testimony presented and to assess whether the charged theory was supported by the evidence." *State* v. *Chapman*, supra, 229 Conn. 540. We must "assume that the jury found the defendant guilty under the supported allegation, rather than the unsupported allegation." Id., 543–44. We, therefore, conclude that even though there was instructional error through the inclusion of the definition of false pretenses, any error was harmless; see id.; and the defendant's claim fails.

In summary, although there was error in the charge, the error was harmless because we conclude that there was a proper, factually and legally supported path for the jury's robbery and felony murder verdict and, thus, they must stand.

## II

The defendant's second claim is that there was insufficient evidence to support her conviction of attempted possession of narcotics. Specifically, she argues that there was insufficient evidence that she actively attempted to possess narcotics. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence

in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

"Essentially an attempt under § 53a-49 (a)[17] is an act or omission done with the intent to commit some other crime. . . . The act or acts must be something more than mere preparation for committing the intended crime; they must be at least the start of a line of conduct which will lead naturally to the commission of a crime which appears to the actor at least to be possible of commission by the means adopted." (Footnote added; internal quotation marks omitted.) *State* v. *Carey*, 13 Conn. App. 69, 74–75, 534 A.2d 1234 (1987).

We conclude that there is a reasonable view of the evidence that supports the jury's verdict of guilty of attempted possession of narcotics beyond a reasonable doubt. At trial, Lamond Daniels, whose DNA was found in the back seat of Bouffard's Lincoln town car, testified that he was in the car as part of a drug trade. Daniels testified that a "black guy" and a "white female"[18] were driving the car, and that, through the use of an intermediary, he exchanged cocaine for the use of the car.

The defendant argues that Daniels' testimony was inadequate to support the finding beyond a reasonable doubt that the defendant engaged in a course of conduct intending to culminate in the purchase and possession

of narcotics. Specifically, the defendant argues that there was insufficient evidence for the jury to find that she was in the car and that the transaction with the intermediary involved drugs. We are unpersuaded.

There was evidence that the defendant took the keys to Bouffard's Lincoln shortly after Turner killed Bouffard, and the defendant and Turner regularly used it thereafter. Daniels' DNA was found in Bouffard's Lincoln, and he testified that he gave cocaine to the intermediary in exchange for the use of the car. He also gave a basic description of the people in the car. The jury reasonably could have concluded that the defendant and Turner used the car after the murders to buy drugs, the defendant was present and involved in the transaction, which involved narcotics, and the defendant, therefore, engaged in conduct intending to result in the possession of narcotics.

"We will not second guess the jury's verdict on the basis of some vague, speculative or amorphous feeling that some doubt of guilt is shown by the cold printed record. . . . We have not had the jury's opportunity to observe the conduct, demeanor and attitude of the witnesses, and to gauge their credibility." (Citation omitted.) *State* v. *Peruccio*, 47 Conn. App. 188, 196, 702 A.2d 1200 (1997), cert. denied, 243 Conn. 964, 707 A.2d 1266 (1998). We conclude that the evidence presented at trial was sufficient to support the defendant's conviction of attempted possession of narcotics.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] In this opinion, we refer to Elizabeth Turner as the defendant, to Claude Turner as Turner, and to them collectively as the Turners.

[2] Section 53a-54c was amended by No. 15-211, § 3, of the 2015 Public Acts; those amendments made technical changes and added a separate predicate felony, neither of which are relevant to this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[3] This was referred to as "the bail scam" or "bail scheme" on appeal and at trial.

[4] A larceny by false pretense occurs when a person, "by any false token, pretense or device . . . obtains from another any property, with intent to defraud him or any other person." General Statutes § 53a-119 (2).

[5] We note that the state never asserted in its closing arguments that the conduct engaged in by the defendant prior to the murders, most particularly the bail scam, could be the predicate felony for robbery and felony murder because it was part of a continuous course of larcenous conduct. Rather, the state argued: "But a robbery with force, the evidence that supports that here, is that . . . the defendant . . . admitted that she had come up with this . . . bail scheme whereby [the Turners] were going to get money out of [Bouffard]. And what happened was, she said to [Turner], got to get fifty bucks. Tell her that I've been arrested. [Bouffard] gives him fifty bucks. Off they go. They use the money for drugs, according to what [the defendant] said. Next, she sends [Turner] back. You've got to get some more money. Sends him back to get another $50. [Bouffard] gives up the $50. But the problem is this. There is no bail. She hasn't been arrested. This is larceny by false pretenses . . . .

"And you also know that with respect to this, that she used that money on drugs, and she admitted that . . . . So, I would argue at this point, we know from that that the state has proven that there was a larceny at that point.

"The force that's involved is any type of physical power over somebody else, and that can be used to either prevent them from keeping their property

or compelling them to give you up their property.

"Here, what we know is, according to [the defendant's] statement . . . she heard some banging. She heard [Turner]—her statement was that she heard banging, she came downstairs, she saw him stabbing Michael [Perkins], and she knew that [Bouffard] must be dead because she didn't come out of her room. You can infer that the only reason the defendant would think that [Bouffard] is dead at that point was because she knew that [Bouffard] had already been stabbed by [Turner]. Why would she think that [Bouffard] was dead at that point in time just because she heard some thumping or bumping? We know . . . that [Bouffard] died from multiple stab wounds. So, I would submit to you, the state has proven a robbery, a larceny plus force, beyond a reasonable doubt.

\* \* \*

"And, 'in furtherance of,' means it has to be connected to the robbery or the flight from the robbery. So, again, the actions of the defendant or another participant has to have caused the death of [Bouffard] and it must be done in some way to aid the robbery in some way or further the purpose of the robbery. The evidence here is, you have the defendant's statement in Baltimore *where she said that immediately after [Turner] finished stabbing Michael [Perkins], he came upstairs, he gave her [Bouffard's] purse. She went through it. She took out the money, the gift cards, and then they were stealing items out of that house for the next few days. The robbery continues as long as they continue to steal from the home.*

"You also have the [defendant's] statement . . . with regard to the bail scheme, and that's the genesis of the larceny. And then when the forces are being applied to [Bouffard], it morphs into a robbery. *At this point in time, the larceny continued.* Even though [Bouffard] may have passed away, that larceny continues." (Emphasis added.)

[6] We note that the defendant challenges only the charge in regard to its inclusion of larceny by false pretenses as a type of larceny, given the context of this case, and does not challenge the court's charge as to the elements of robbery and felony murder. The court charged the jury on felony murder and robbery in part as follows: "The defendant is charged in count one as to [Bouffard] and in count two as to Michael Perkins . . . with felony murder. The statute defining this offense reads in pertinent part as follows: 'A person is guilty of murder when, acting either alone or with one or more persons, she commits or attempts to commit robbery, and in the course of and in furtherance of such crime or of flight therefrom, she, or another participant, if any, causes the death of a person other than one of the participants.'

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: The first element is that the defendant, acting alone or with one or more other persons, committed or attempted to commit the crime of robbery of [Bouffard], as to count one, [and] Michael Perkins, as to count two. . . .

"[Section] 53a-133 of the Penal Code defines robbery as follows: 'A person commits robbery when she, in the course of committing a larceny, she or another participant in the crime uses or threatens the immediate use of physical force upon another person for the purpose of: (1) preventing or overcoming resistance to the taking of the property or the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.' Thus, the elements of robbery are (1) in the course of a larceny; and [2] uses physical force.

\* \* \*

"[To prove that the defendant was committing larceny], the state must prove beyond a reasonable doubt that the defendant would have to . . . (1) wrongfully take property from the owner; and (2) she did so with the intent to permanently deprive the owner of their property or permanently appropriate the property to herself or a third person. If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of the crime of larceny, then you shall consider the second element of robbery, the use of physical force.

\* \* \*

"If you find that the defendant or another participant in the crime used physical force or threatened its immediate use in the course of committing a larceny, you must then determine whether such physical force was used or threatened for the purpose of preventing or overcoming resistance to the taking of property or to ret[ain] . . . property immediately after the taking, or compelling the owner of the property or another person to deliver

up the property or to engage in other conduct that aids in the commission of larceny.

\* \* \*

"The second element is that the actions of the defendant or another participant in the crime of robbery or attempted robbery were the proximate cause of the death of [Bouffard], as to count one, and Michael Perkins, as to count two.

\* \* \*

"The third element is that the defendant or another participant caused the death of [Bouffard], as to count one, and Michael Perkins, as to count two, while in the course of, and in furtherance of, the commission or attempted commission of the crime of robbery, or immediate flight from the crime. This means that the death occurred during the commission of a robbery or attempted robbery and in the course of carrying out its objective.

" 'In the course of the commission' of the robbery or attempted robbery means during any part of the defendant's participation in the robbery or attempted robbery. The phrase 'in the course of the commission' is a time limitation and means conduct occurring immediately before the commission, during the commission, or in immediate flight after the commission of the robbery or attempted robbery. The immediate murder of a person to eliminate a witness to the crime or to avoid detection is also 'in the course of the commission.' Thus, the death of [Bouffard] as to count one, and Michael Perkins as to count two, must have occurred somewhere within the time span of the occurrence of facts which constitutes the robbery or attempted robbery.

" 'In furtherance of' the robbery or attempted robbery means that the killing must in some way be causally connected to or as a result of the robbery or attempted robbery or the flight from the robbery or attempted robbery. The actions of the defendant or other participant that caused the death of [Bouffard] as to count one, and Michael Perkins as to count two, must be done to aid the robbery or attempted robbery in some way or to further the purpose of the robbery or attempted robbery. . . .

"The fourth element is that [Bouffard] as to count one, and Michael Perkins as to count two, was not a participant in the robbery or attempted robbery."

[7] In *Stromberg*, the defendant was convicted under a California statute that provided: "Any person who displays a red flag, banner or badge or any flag, badge, banner, or device or any color or form whatever in any public place or in any meeting place or public assembly, or from or on any house, building or window as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character is guilty of a felony." (Internal quotation marks omitted.) *Stromberg* v. *California*, supra, 283 U.S. 361. The United States Supreme Court concluded that the first clause regarding the display of a flag "as a sign, symbol or emblem of opposition to organized government" was "repugnant to the guaranty of liberty contained in the Fourteenth Amendment. The first clause of the statute being invalid . . . the conviction . . . which so far as the record discloses may have rested upon that clause exclusively, must be set aside." (Internal quotation marks omitted.) Id., 369–70. *Stromberg* differs from the present case in a fundamental way; in *Stromberg*, the United States Supreme Court could not discern if the jury's verdict was constitutionally infirm. Here, as we explain, no constitutional infirmity exists, and the jury had an appropriate, fact based path to its verdict on the robbery and felony murder charges.

[8] The state also argues that the defendant waived any instructional error claim when she stated that she had no objection to the court's charge. Although the defendant previously made statements that she did not object to the language in the court's charge, the defendant specifically objected to the larceny by false pretenses being presented as a predicate for felony murder and argued that the facts did not support the bail scheme as a predicate felony. Thereafter, during a charging conference, the court ruled that whether the bail scheme, as part of a continuous course of conduct, was a predicate felony was a question of fact that was properly left for the jury, and the defendant objected again for the record. This is a close question and we, therefore, presume the issue to be preserved and review the merits of the defendant's claim. See *State* v. *Salmond*, 179 Conn. App. 605, 625–26, 180 A.3d 979 ("[T]he sina qua non of preservation is fair notice to the trial court. . . . An appellate court's determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated [in the trial court] with sufficient clarity to place the trial court on reasonable notice of that very same claim."

[Internal quotation marks omitted.]), cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018).

[9] General Statutes § 53a-54c, titled "Felony murder," provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[10] Although we are unaware of any case law supporting, or refuting, the proposition that a larceny by false pretenses, in concert with other conduct, can constitute a predicate felony for robbery and felony murder, logically, we see no reason why an individual could not be convicted of robbery on the facts set forth in the hypothetical or other similar scenarios.

[11] Although the court should not have charged on larceny by false pretenses, the defendant does not dispute that the rest of the charge was appropriate.

[12] The trial court charged in relevant part: "Larceny is a separate offense, which has two elements. The statute defining larceny reads in pertinent part as follows: A person commits larceny when, with intent to deprive another . . . of the property or to appropriate the same to herself or a third person, she wrongfully takes, obtains or withholds such property from an owner . . . . 'Larceny' simply means theft or stealing. Larceny also includes 'obtaining property by false pretenses.' 'False pretense' means a false representation of fact. Since nothing to happen in the future can properly be referred to as a fact, the representation must relate to past or present circumstances and not to future events. A representation may be made in writing, verbally, or even by actions or conduct. It is an expression . . . of a fact upon which it is expected that others will rely. Usually a representation takes the form of a statement of fact, oral or written, but it may involve conduct only. Because a false pretense refers to past or existing facts, a mere promise to do something in the future is not a false pretense. Furthermore, a mere statement of opinion, as distinguished from a statement of fact, is not a false pretense. Puffing, exaggeration, praise of an article for the purpose of selling it, or giving an opinion as to the value or worth of property are not ordinarily a specific basis for a charge of false representation."

[13] In the defendant's brief, she states, "[t]o be sure, the theft of money and gift cards from Bouffard's purse immediately after her death can support a [conviction of] robbery and felony murder." Likewise, during oral argument, the following exchange occurred between Judge Prescott and defense counsel:

"Q. As you concede in your brief, there was a lawful basis . . . [for] the verdict that the jury rendered, and it was a path that was support[ed] by the evidence.

"A. Yes.

* * *

"Q. Could the defendant have been convicted of robbery because it was necessary to kill Michael Perkins in order to complete the theft of items generally from the house without any evidence, or any specific evidence, that the property that was taken belonged to Michael Perkins?

"A. That would be a valid legal theory."

[14] As the state argued in closing: "[K]eep in mind that [the] defendant shared, throughout the course of this, in the proceeds from the crime. She shared in the proceeds from the crimes that occurred before the killing with the stealing from the safe, with the stealing from the envelope, she and [Turner] were in on that together. She and [Turner] were in on it together when they tricked [Bouffard] out of a hundred dollars and she and [Turner] were in on it together after the killings. So how—how can you argue, reasonably, I mean, with your common sense that [the defendant] had nothing to do with the killings? She was in on the stealing before with the safe, stealing before with the envelope, stealing before with the larceny by false pretenses, and the numerous acts of stealing afterwards. But that piece, the killings, she didn't know anything about it, and she wasn't any part of it. That just doesn't make sense, and that flies in the face of the evidence and of common sense."

[15] Additionally, there was evidence before the jury that, in the days following the murders, the defendant appeared at ease, and was seen laughing and joking. Specifically, the defendant had lunch with her mother the day after the murders and had acted normally, the defendant had gone by herself to retrieve the Lincoln town car and returned to Bouffard's home rather than trying to remove herself from the situation, the defendant attempted

to hide from police in Baltimore, and she was seen kissing Turner through the bars of her cell after her arrest.

[16] In its closing argument, when discussing the count charging larceny in the third degree, the state argued: "Well, so, what was stolen here? You heard the testimony—[the] defendant's own statement that she took money and the gift cards from [Bouffard's] purse. You know that she took Michael [Perkins'] bank card, there was the [television]. You saw them trying to pawn that . . . . The Wii, the guitar, the cell phone, the jewelry, the gun, the camper, and the scooter, all of those things that were stolen out of the house, all of those things belonged to [Bouffard] and Michael Perkins, and they were the rightful owners. So, I would submit to you that the state has proven that there was a theft of property."

[17] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[18] Turner is African-American; the defendant is Caucasian.